[No. 1371.]

Henry Pickens *v.* The State.

1. Evidence—Practice.—The credibility of witnesses and the weight of their testimony are questions committed exclusively to the jury, and their finding thereupon, when there is a sufficiency of inculpatory evidence to sustain a verdict, will not be revised by this court.

2. Same—New Trial.—See the opinion *in extenso* for a state of case wherein a new trial should have been awarded, notwithstanding that the showing therefor was not in strict conformity with the rules governing motions for new trial.

W

3. Charge of the Court—Malice.—In a prosecution for assault with intent to murder, the court instructed the jury that "malice is when one with a sedate and deliberate mind and formed design kills another, and such killing is murder." *Held*, erroneous, inasmuch as killing, to constitute murder, must not only be committed with a sedate and deliberate mind, and formed design, but must have been committed unlawfully, and .under circumstances which do not excuse or justify the act. See the opinion in illustration.

Appeal from the District Court of Caldwell.  Tried below before the Hon. L. W. Moore.

The indictment charged the appellant with an assault with intent to murder one Charlie Stephens, in Caldwell county, on the fifteenth day of June, 1882.  The trial resulted in a verdict of conviction, and a term of two years was assessed against the appellant as punishment.

Charlie Stephens was the first witness presented by the State. He identified the defendant, who, he testified, had lived with him during a portion of the first half of the year 1882.  On the day before the commission of the offense for which he was now prosecuted, the defendant applied to the witness for a yoke of oxen which were then in his lot, and which belonged to a neighbor.  The witness refused to let him have the oxen, whereupon the defendant cut at him with a knife, and rode off, saying that he would return.

The witness and his family live in the country.  On the night of June 15, 1882, at some hour before day, he was awakened by some one calling him from the outside.  He got up from the bed in which he and his wife were sleeping, and opened the door, at which time a shot was fired toward the house, the ball striking a chair which stood on the gallery and against the door which opened into the house.  He distinctly heard talking on the outside of the house, and as distinctly recognized the defendant's voice.

On cross-examination, the witness testified that there was more than one person in his yard on the occasion referred to, and that more than one shot was fired, but only the one mentioned struck the house or chair.  The witness discovered the tracks of two persons in and about his yard on the next morning, and these tracks led from a point, near the house, where horses had been tied.  The house of the witness fronted east, and the door spoken of looked in that direction.  The ball which struck the

chair standing against this door was fired by some one standing north of the house, near a corner of the yard. While the witness could not positively and emphatically swear before Almighty God that he recognized the voice of the defendant, he felt very certain that he did. Three shots in all were fired, the two first from the south of the house, and the last one from a point north of the house.

Belle Stephens, wife of the witness Charlie Stephens, testified, for the State, that sometime between midnight and day, on the night of June 15, 1882, she was awakened by the discharge of fire-arms in her yard, and some one calling for her husband. She got up from the bed occupied by her husband and herself, and mounted another small bed near a door, and looked out through a long crack running over the door. While looking through this crack, she saw the defendant, who was standing near the north corner of the house, shoot. The witness recognized him by the clothes he wore, with which she was perfectly familiar, the defendant having lived at the house. She also saw the defendant by the blaze from the discharge of the pistol, and by that means recognized him. Three shots in all were fired, two from the south, and one from the north of the house. The defendant did not fire the two from the south. The witness saw some other person besides the defendant in the yard at the same time.

Cross-examined, the witness located the defendant at the time he shot, and when she saw and recognized him, near the chimney, which stood in the middle of the north side of the house. When she saw him, she was looking over the door, which fronted east with the house. She could not explain how, in looking out from a crack over the east door, she managed to see and recognize the defendant, who stood at the north corner of the house, but she knew that she did. The defendant wore a striped shirt and a pair of dark gray pants. She did not know the color of his hat. She had seen his pants before, and knew them. She could not tell the color of the clothing worn by the other person. The witness and her husband were in the house, and she could tell who the defendant shot at.

S. Huff testified, for the State, that some days after the shooting at Stephens's, the defendant told him, in conversation, that he had better stay out of Charlie Stephens's pen, as he might be taken for Stephens and get shot. He said nothing about the previous shooting.

The motion of the defendant to postpone was based upon the fact that the defendant had been previously tried by an examining court for the alleged attempt to shoot Stephens, and had been released, wherefore he thought that the present prosecution was for his alleged attempt to cut Stephens with a knife, to disprove which he brought a competent witness and had him placed under the rule. The motion alleged that the defendant was not apprised of this misapprehension until after the State had introduced one witness and proved both acts, of shooting and attempting to cut, at different times, and until after the State had closed and announced for which act the defendant was being tried; wherefore the defendant asked a postponement, in order to produce witnesses to prove an *alibi* in his behalf. The motion for new trial also raised the other questions involved in the rulings.

No brief for the appellant has reached the Reporters.

*O. S. Eaton*, for the State.

WILLSON, J.   Defendant stands convicted of an assault upon one Charlie Stephens, with intent to murder him. Without reciting or commenting upon the evidence upon which the conviction is based, we will say that to our minds it is very unsatisfactory, and its credibility in some important respects not unquestionable. There is, however, enough evidence to support the conviction, and this being the case, the jury were the exclusive judges of the credibility of the witnesses, and the weight to be given their testimony, and we would not, because of its uncertain and unsatisfactory character to our minds, disturb the verdict of the jury.

In view, however, of the very meagre evidence by which the defendant was identified as the party who did the shooting, and the *intent* with which the act was committed, whether to kill or merely to frighten the party alleged to have been assaulted, and also in view of the fact that defendant moved the court to postpone the trial to enable him to obtain material witnesses, and of the further fact that the court refused to allow him to examine a witness offered, because the witness had not been placed under the rule with the other witnesses in the case, although this was a matter of discretion with the court, we are of the opinion that, under all the circumstances, the court should have granted the

defendant's motion for a new trial, though it was not in strict compliance perhaps with the rules governing such motions.

We think, further, that the court erred in its charge to the jury in not defining malice correctly. We copy the definition given: "Malice means that state of a wicked and depraved mind fatally bent upon mischief. Malice is when one with a sedate and deliberate mind and formed design kills another, and such killing is murder." It is the last sentence of the clause quoted that we think is erroneous. It instructs the jury, without qualification, that it is murder when one with a sedate and deliberate mind and formed design kills another. Such is not the law.

Excusable or justifiable homicide may be committed with a sedate and deliberate mind and formed design to kill. The sheriff, when he executes the death penalty upon a convicted murderer under and by virtue of a lawful death warrant, does so with a sedate and deliberate mind, and a formed design to kill the man. A man in the lawful defense of his person or his property may kill another without committing murder, and yet he may commit the act with a sedate and deliberate mind, and a formed design to kill. To make the killing murder, it must not only be committed with a sedate and deliberate mind and a formed design to kill, but it must be done under circumstances which do not justify or excuse the act. It must be an unlawful killing. There are a number of decisions of this court which elaborately consider the question of what is malice in law, and which contain approved definitions of the term. We refer to them in support of our conclusion that the charge given upon the subject in this case is not a correct definition of malice, and was well calculated to mislead the jury. (*Cox* v. *The State,* 5 Texas Ct. App., 493; *Looney* v. *The State,* Id., 188; *Harris* v. *The State,* 8 Texas Ct. App., 109; *McKinney* v. *The State,* Id., 626.)

The judgment is reversed and the cause remanded for a new trial.

*Reversed and remanded.*

Opinion delivered January 24, 1883.